## McCurdy v. Standard Realty Corporation et al.

Oct. 29, 1943.

Richard Priest Dietzman for appellant.

Dodd and Dodd, Thomas A. Ballantine, and B. L. Shamburger for appellees.

588

Opinion of the Court by Stanley, Commissioner—
Affirming.

The case involves an implied restrictive agreement concerning the use of real property, or, as it has been called a reciprocal negative easement. It is a covenant which equity raises and fastens upon the title of a lot or lots carved out of a tract that will prevent their use in a manner detrimental to the enjoyment and value of neighboring lots sold with express restrictions in their conveyance. The question is brought to us by an appeal from a judgment sustaining a demurrer to and dismissing an intervening petition. The primary case was a suit for specific performance of a contract of sale between two of the appellees and is not of importance here except that the intervening petitioner prayed that the relief she sought be included in the judgment.

The Westover Development Company acquired title to a tract on both sides of Western Parkway in Louisville for the purpose of subdividing the whole of it into residential lots. In 1927 or 1928, it platted the portion of the tract lying north of Greenwood Avenue and named it Westover Park. In this record it is called Section No. 1. It is alleged that the company adopted a general plan for the development of the entire acreage, with a series of restrictions, one of which was that none of the tract should be sold to persons of African descent. These restrictions were incorporated in an agreement or document relating exclusively to Section No. 1, recorded in the office of the clerk of the Jefferson County Court. It is further alleged that it was the company's intention to incorporate similar restrictions into the conveyance of all the acreage and that it "announced its intentions generally and to the public at large by recording" the agreement, and "further by announcements made in connection with auction sales of the lots included in said subdivision." At that time the remainder of the tract on the south side of Greenwood Avenue was not subdivided. The petitioner, Mrs. Helen McCurdy, now appellant, purchased one of the lots in Section No. 1 at the original sale with the understanding and upon the belief that the rest of the tract would be developed and sold in the same way and in keeping with the covenants and restrictions contained in the deed to the lot which she purchased, and in conformity with the recorded covenants and repeated public announcements made by the Westover Development Company. In reliance upon those

statements, she bought the lot and spent money in erecting a residence and otherwise improving it. Many others did the same thing under those conditions. All of the property in Section No. 1 is owned and occupied by white people.

The Company later subdivided the remainder of the tract and called it "Westover Park, Section No. 2." These lots were offered at auction on July 11, 1939, with public announcements that they were to be restricted against ownership and occupancy by negroes. It seems that the sales were ineffective or never made. Thereafter a contract was entered into by which the Westover Development Company sold all of Section No. 2 to the Standard Realty Corporation, which had been organized by negroes for the purpose of acquiring the tract and selling the lots for residences of colored persons. The Shawnee Improvement Company, created by neighboring white people, also obtained a contract from Westover Development Company to buy the same property. The original suit involved these two contracts. The court adjudged specific performance of that made with the Standard Realty Corporation.

It is alleged in the intervening petition that this purchasing corporation "knew or should have known" that the Development Company had consistently and repeatedly announced that Section No. 2 constituted a part of the general plan of development of the entire acreage of Westover Park and that its ownership was restricted as described. It is further alleged that notwithstanding these things the Standard Realty Corporation was asserting that it had obtained the property free and clear of restrictions. It is pleaded that this contention was contrary to the publication and generally known plan of development originally adopted by the Westover Development Company, and in reliance upon which the plaintiff had purchased and improved her lot; that should this Section No. 2 be sold without the restrictions, in addition to violating the plan adopted and the representations made, it would materially impair the value of the property of the plaintiffs and others similarly situated. Appropriate relief was prayed, but the court adjudged that the Standard Realty Corporation acquired title without any restriction.

Stemming from the failure or inadequacy of common-law principles, which were developed in a spirit of

hostility to restraints on real property, the public zoning of private land and the attachment of equitable or implied servitudes have been developed in the last half-century or so in order to meet problems arising from industrial and commercial operations and other detrimental conditions, sometimes only social or aesthetic, in residential sections of cities. Among them is the possibility of creating restrictions in favor of the land of third persons. This development has been called ''an equitable appendix to the common law as to servitudes.'' ''The Progress of the Law, Equitable Servitudes.'' 33 Harvard Law Review, 813, op. cit. 814; ''Fifty Years of American Equity,'' 50 idem, 171, op. cit. 215; Note, ''A New Phase in the Development of Affirmative Equitable Servitudes,'' 51 idem, 320. The history and interpretation of this subject, with various illustrative or concrete cases, are given in those articles. The servitude may be affirmative or negative. Among the applications are equitable easements or servitudes to city lots by reason of ''building schemes'' and of sales made from plats or plans laying out streets or showing restrictions and rights, or other circumstances which reasonably lead purchasers to believe that they existed.

It sometimes occurs that a case decided years before a legal view or concept was definitely or generally accepted, or the law pertaining to the subject matter had become crystallized or classified, will be found which recognized the principle. Sometimes such a case but foreshadows the establishment of a doctrine by gradual processes. The principle of equitable servitude was recognized and applied by this court in January, 1848, in the case of Rowan's Executors v. Town of Portland, 47 Ky. 232, 8 B. Mon., 232. In 1812, General William Lytle laid off the town of Portland adjacent to the Ohio River below the town of Louisville. The plat was duly recorded. A public sale was had of some of the lots in 1814. A second sale, following advertisements and public representations, was had in 1817. Prior to this second sale General Lytle had caused a second plat of the town to be recorded which showed some additions as well as alterations. The second plat did not show the cross streets extending down to the river's edge beyond Water Street as in the first plat, or Front Street, the name given the corresponding street on the new plat. The space between these streets and the river was left entirely open without division or discrimination by which

the use or purpose or proprietorship of one part might be distinguished from that of any other. Subsequent sales were made by this new plat. This was regarded by the court as a written and recorded representation of the town, its divisions, streets, commons and public grounds, and it was held to have entered into and formed a part of every contract for the sale of a lot. It was further held that every purchaser of a lot according to the plan acquired as an irrevocable appurtenance an interest in the advantages and privileges pertaining to the public places disclosed thereon, particularly in the space between the streets and the river, even though it was a private development and not a public establishment of a town by trustees.

The principle of reciprocal negative easements applicable to conditions like that presented in this appeal is well covered by Sanborn v. McLean, 233 Mich. 227, 206 N. W. 496, 60 A. L. R. 1212; McComb v. Hanly, 132 N. J. Eq. 182, 26 A. (2d) 891, 144 A. L. R. 912, and annotations. We think it quite apparent that the doctrine ought to be used and applied with extreme caution, for it involves difficulty and lodges discretionary power in a court of equity, in a degree, to deprive a man of his property by imposing a servitude through implication.

In the Sanborn case, supra, it is related that in 1891 a subdivision of Detroit was planned by McLaughlin strictly for resident purposes on Collingsworth Avenue. Ninety-one lots on that avenue were sold and residences erected thereon. Many of the deeds contained the express restriction to residence purposes but some of them did not, though in every instance the plan had been observed for thirty years. The united efforts of all persons interested had carried out the common purpose of making and keeping all the lots strictly for residences. One of them was acquired through mesne conveyances by McLean and wife who purposed to erect a gasoline filling station on the rear end of it facing another street. It was held that title to their lot was burdened with a reciprocal negative easement, created by the common grantor of all the lots with the right to demand observance thereof passing to each purchaser of the other lots in the subdivision having notice of the easement. It was held that as the recorded deeds of the lots on the plat contained restrictions to perfect and carry out the general plan and resulting servitude, and as the McLean's lot was within its scope, they and their predeces-

sors in title were bound by constructive notice. The Mc-Leans had had an abstract of title to their lot made when they purchased it and it did not reveal any restriction; and he also claimed that the grantor had informed him it was unrestricted. A partly finished dwelling was then on the lot. The court thought that considering that the character of the use made of all the lots was open to their view, they were put upon inquiry into the record beyond merely asking their grantor.

In Bimson v. Bultman, 3 App. Div. 198, 38 N. Y. S. 209, the court predicated its conclusion that a negative restriction existed on a lot upon the fact that there was a general plan and building scheme for the tract of which it was a part as evidenced by previous conveyances, in which the manner of occupation and improvement was limited and of which the purchaser had notice. And in LaFetra v. Beveridge, 124 N. J. Eq. 24, 199 A. 70, it was held that a neighborhood or community scheme was created by the filing of a map of the development for residential purposes and by numerous conveyances containing substantially uniform restrictions, including the prohibition of use for business purposes and that by reason thereof there was an implied covenant on the part of the grantor that he would neither convey any portion of the subdivision without those restrictions nor devote the remaining property to the prohibited purposes. An injunction was granted against his heirs from doing so.

In Scull v. Eilenberg, 94 N. J. Eq. 759, 121 A. 788, it is pointed out that while there are various ways by which neighborhood schemes involving reciprocal limitations and rights may be created, the most complete way is where the common grantor inserts like covenants in all deeds or sales of the lots, or sells them upon representations to the individual purchasers that like covenants will be inserted in other deeds for the common benefit, or pursues a course of conduct indicating a general scheme leading the purchasers to assume its adoption and adherence by all owners to it.

In McComb v. Hanly, supra, it appears there were two different tracts platted as one development or subdivision, called Sections No. 1 and No. 2. Conveyances of the lots contained a series of restrictions, the preamble of each reciting that they applied to the property "hereby conveyed only." While recognizing the prin-

ciple of imposing such servitudes upon each lot where there is a general plan or scheme for doing so, although there was an omission in particular conveyances, the court held the word "only" was so significant that it must be regarded as definite notice that the vendor reserved to itself the power to deal freely with restrictive features as it saw fit in succeeding conveyances. The court also denied application of the doctrine of implied servitudes upon the ground that the initial grantor had effected the restrictions upon the manner of use even though it or its agents orally represented to purchasers at the time that the other lots would have the same restrictions imposed upon them when conveyed in the course of subsequent sales.

The other cases summarized in the annotations in 60 A. L. R. 1216, and 144 A. L. R. 916, recognized the possibility of creating reciprocal servitudes of this character upon all lots in a subdivision by implication of a general scheme or plan of development. But no other case is disclosed where a court imposed or fastened such restriction, tangible or substantial legal basis for it being absent. In our own case of Bondurant v. Paducah & Illinois R. R. Co., 186 Ky. 794, 218 S. W. 257, although the doctrine or principle herein discussed was not mentioned, we held that a mere adoption of a custom or system on the part of the owner of a tract of land to exact restrictive covenants from purchasers of lots therein, limiting the manner of their use, does not by implication charge the remaining lots of the grantor with corresponding restrictions where the grantor did not agree to insert such restrictions in conveyances of lots to be sold thereafter.

The appellant makes special reference to Scheuer v. Britt, 218 Ala. 270, 118 So. 658, 659, as sustaining her contention that the prohibition of ownership or occupancy of any part of Section No. 1 of Westover Park by persons of African descent was annexed to the title to lots in Section No. 2. In that case it appears that Mamie D. Jones owned a tract which was platted and sold at auction by a real estate agency upon advertisements and public announcements that all lots were to be "for residential purposes only." The conveyances contained the provision, "All lots sold for residential purposes only," and other restrictions. As its compensation, she conveyed to the real estate firm the east half of the subdivision without the restrictions. It appears they sold

some of the lots and incorporated in the conveyances the same restrictive covenants of the initial deeds, excepting a conveyance to Britt. They reconveyed to the original owner, Mrs. Jones, the balance of the east half without the restrictions. A suit was instituted by Scheuer, who had acquired a lot among those first sold, to enjoin Britt from erecting storehouses and filling stations which he had begun on his lot after applying to Scheurer for his consent, which he refused to give. The court held an injunction should have been granted upon the ground that there was a building scheme for the entire subdivision which had formed an inducement to buy the lots and a part of the consideration. The court said: ''The restrictive covenant in the deed to complainant and others, that 'all lots sold for residential purposes only,' is some evidence, in fact strong evidence, if not conclusive, that such general scheme was inaugurated with reference to the subdivision. Harvey v. Rubin, 219 Mich. 307, 189 N. W. 17.''

Our recent case of Foos v. Engle, 295 Ky. 114, 174 S. W. (2d) 5, is not unlike Scheuer v. Britt, supra. We again recognized that restrictions contained in a general plan or scheme for the uniform development of a tract as building lots inure by implication to the benefit of all purchasers and held that where the owners of a tract conveyed it to a realty company for the purpose of subdividing and selling it in order to pay lien debts, which it did under a general plan, the owners to whom certain lots were reconveyed were bound by the restrictions.

It does not appear that the east half of that subdivision was as distinctly separated from the other half as is Section No. 2 from Section No. 1 of the subdivision with which the case at bar is concerned. The greater distinction, however, is that upon which the decision was principally rested, namely, the effect of the provision incorporated in all other deeds that all lots were sold for residential purposes only and that the purchaser had knowledge of the restriction. The facts almost, if not altogether, bring the case within the class where every deed contained express covenants like in Biltmore Development Co. v. Kohn, 239 Ky. 460, 39 S. W. (2d) 687, and Greer v. Bornstein, 246 Ky. 286, 54 S. W. (2d) 927.

The appellant's case is deficient, it seems to us, in respect to the time and character of the representations

claimed to have been made, and weak in respect to the notice or knowledge of the purchaser, the appellee, Standard Realty Corporation, when it bought all of Section No. 2. To create the burden of an equitable or implied restriction by reason of a general plan and scheme, it must have been annexed by a contemporaneous, enforceable agreement. Sprague v. Kimball, 213 Mass. 380, 100 N. E. 622, 45 L. R. A., N. S., 962, Ann. Cas. 1914A, 431; Werner v. Graham, 181 Cal. 174, 183 P. 945; McBride v. Freeman, 191 Cal. 152, 215 P. 678. The only claim of such an agreement is that when Section No. 1 was laid out and sold it was orally announced that whenever the rest of the tract lying across the street should be platted and sold the lots would carry similar restrictions. The advertisements and public announcements relating to the ineffective auctioning of the lots in Section No. 2 cannot be regarded in and of themselves as creating the burden or an encumbrance as against a subsequent bona fide purchaser. Holliday v. Sphar, 262 Ky. 45, 89 S. W. (2d) 327. We think the basis of appellant's contention is too elusive and unsubstantial to call for the imposition of the restriction through implication or as a matter of equity. The allegation of notice by the purchaser would seem to be reduced to the averment that it "knew or should have known" of the conditions and oral promises made twelve years before when the lots in Section No. 1 were first sold, which was long before the corporation came into existence; but it is not necessary that the matter of notice should be considered.

The judgment is affirmed.