Joseph L. ARNOLD et al., Appellants,

v.

William H. MITCHELL, Appellee.

FAYETTE ENTERPRISES, INC., et al.,
Appellants,

v.

William H. MITCHELL, Appellee.

Court of Appeals of Kentucky.

Jan. 31, 1964.

Rehearing Denied May 8, 1964.

John W. Morgan, Allen Duncan, Duncan
& Arnold, Lexington, Robert M. Odear,

Stoll, Keenon & Park, Lexington, for appellants.

Harry B. Miller, Miller, Griffin, Marks & Stephens, Lexington, for appellee.

PALMORE, Judge.

Over a period of more than 6 years beginning in the latter part of 1952 William H. Mitchell, Joseph L. Arnold and G. Frank Vaughan, Jr., were closely associated in several Fayette County real estate development ventures. Cardinal Hill Development Corporation is a corporation formed by them in that connection. Fayette Enterprises, Inc., is another corporation subsequently formed by Arnold alone. In 1959 there was a falling out, especially between Mitchell and Arnold, after which Mitchell filed two suits, one against Arnold, Vaughan and Cardinal Hill Development Corporation and the other against Arnold, Vaughan and Fayette Enterprises. The actions were consolidated and referred to the Master Commissioner of the Fayette Circuit Court, whose eventual findings and conclusions regarding the various claims and counterclaims were approved and became the basis of the final judgment. Each of the defendants appeals, and Mitchell cross-appeals, from one phase or another of the judgment as will be explained in the course of this opinion.

### Cardinal Hill Subdivision

In 1952 Vaughan owned a 22-acre tract of land which he desired to subdivide and sell. He engaged Mitchell, an experienced real estate man, to assist him in the establishment and development of the subdivision and to sell the lots. At the inception and during the early stages of the venture there was no firm agreement as to the amount of Mitchell's compensation. His services entailed much more than the mere selling of lots already subdivided and ready for sale, and he wanted more than the standard 5% commission. Vaughan, on the other hand, was opposed (at least in the beginning) to a flat percentage, preferring some other type of incentive arrangement. While the understanding between the two

men was in this uncertain state several lots were sold or contracted for sale, and Vaughan learned that unless some different plan of development and sale were effected the Internal Revenue Service would treat his profits as ordinary income rather than capital gains. After investigating this problem Arnold, Vaughan's attorney, advised the formation of a corporation and an interim agreement of association to cover the sales consummated or in progress prior to completion of the incorporation. Such an agreement, drafted by Arnold, was signed by the three men as of September 15, 1952. It provided for a sale of the property by Vaughan to the corporation when organized and for the performance of various services by Arnold and by Mitchell, and it included the following recitations and terms which are relevant to the present dispute:

"* * * and whereas, the parties hereto contemplate forming a corporation to purchase said land in its entirety and subdivide same into individual lots for the purpose of re-sale; and whereas, the parties hereto are desirous of associating themselves together as an association for the immediate planning and developing of the area for the purpose of sub-dividing same pending the organization of said corporation heretofore referred to; * * *

"2. The party of the third part, William H. Mitchell, does hereby agree to devote his time and talents as a real estate broker and developer to the development and subdividing of said area for the purpose of selling said lots, either during the tenure of this contract and agreement or *after the corporation above referred to has been organized.* The party of the third part agrees that he will devote his time and effort toward creating and making a subdivision possible and will be paid only a flat sum of five percent (5%) of the gross value for each lot sold *by either the corporation or this association.* It is further understood and agreed that *after said corporation has been formed* and the land sold that an additional three percent (3%) of the total

gross sale price will be paid to the party of the third part for his services rendered to *the association and/or corporation.* * *

"3. * * * It is understood and agreed that all parties hereto will own stock in the corporation proposed to be formed; and that in addition to any dividends that might be paid to party of the second part [Arnold] and to any salary that might be paid to him as an officer of the corporation, that he will be paid a reasonable attorney's fee for the services rendered *to this association and/or corporation to be formed.* It is further understood and agreed that no fees will be paid to the party of the second part either by this association or the corporation to be formed until after all of the land proposed to be bought has been sub-divided and sold and all expenses incurred therein have been paid.

"It is understood and agreed by and between the parties hereto that this contract of association shall become null and void and have no force and effect whatever after the Cardinal Hill Development Corporation has been organized and perfected pursuant to the laws and regulations of the Commonwealth of Kentucky.

"It is further understood and agreed by and between the parties hereto that any and all services performed by the parties during the tenure of this contract and any and all liabilities incurred concerning the purchase, development or sale of the real estate in question shall inure to the benefit of the corporation and/or detriment to the corporation when formed; that *the corporation when formed will be fully responsible for any liabilities incurred and shall be the sole owner of all assets received by this association* or either of the parties hereto; it being the specific intent and purpose of all the parties to this contract that all services performed shall be performed for the benefit of the corporation." (Emphasis added.)

According to Arnold's testimony, upon submission of this contract to the federal

tax authorities Vaughan was permitted to treat his profits on the sale of the land as long-term capital gains, except for the first 4 or 5 lots that had been sold.

Cardinal Hill Development Corporation issued 80 shares of its capital stock, 50 to Vaughan, 20 to Arnold, and 10 to Mitchell. For their shares, Arnold and Mitchell gave the corporation their individual promissory notes in the respective amounts of $2,000 and $1,000. Though payable on demand, it was the tacit understanding that these notes would be satisfied out of Arnold's and Mitchell's distributable shares of the undivided profits upon eventual dissolution of the corporation.

It is conceded that Mitchell was not paid the 3% mentioned in the contract, and in his action against Arnold, Vaughan and Cardinal Hill Development Corporation he was awarded judgment for it against the corporation. This phase of our opinion is directed to the appeal from that decision.

The defense theory is that the parties never intended to be bound by the interim agreement of association,[1] that it was prepared and executed for the sole purpose of securing an income tax advantage for Vaughan,[2] and that Mitchell's ⅛ interest in the corporation was all he was supposed to receive over and above the 5% sales commissions. (In this regard, the tax authorities had advised that if the association included a real estate broker, then in order for Vaughan to qualify for capital gains treatment it would be necessary that the real estate member's interest be something in excess of the regular broker's commission.) Mitchell denied that the written agreement was not intended to reflect the real agreement. The Master Commissioner's report in Mitchell's favor was in effect a finding of fact on this issue, and as it was supported by substantial evidence we cannot say it was clearly erroneous.

We do not believe the issuance of 10 shares of stock to Mitchell for a promissory

1. See Johnson v. Dalton, Ky., 318 S.W.2d 415 (1958).

2. The IRS, of course, was never informed it was not the true arrangement.

note that admittedly would have been uncollectable at the time indicates that the stock was intended in lieu of the 3% additional commission. If the parties had any faith in the enterprise, and clearly they did, there was no question that the note could and would be paid at the time it was actually expected to be paid. Mitchell paid for his stock at exactly the same rate as Arnold did. Moreover, that the agreement provided for both the 3% commission and the issuance of some amount of stock to Mitchell enfeebles the theory that the stock was to be substituted for the extra commission.

■ It is vigorously contended, however, that in view of the provision that the contract "shall become null and void and have no force and effect whatever" upon formation of the corporation the 3% agreement became a nullity by the express terms of the instrument. We do not agree. The contract must be construed as a whole. It repeatedly mentions services to be performed and relationships to exist after the incorporation. Care was taken, for example, to negate any doubt that Arnold was to be paid fees for his legal services in addition to any dividends and salary that might be paid him. It is not suggested that this discreet and altogether wholesome provision became a nullity, and obviously it was not so intended. When read in relation to the paragraph immediately following it, we think the evident purpose of the "null and void" clause was simply to end the association and transfer both its assets and obligations, as a business entity, to the corporation. We concur in the conclusion that the 3% provision continued to apply after the incorporation.

### Mount Vernon Subdivision

■ In 1955 Arnold purchased a tract which became Mt. Vernon Subdivision. He had formed a corporation, Fayette Enterprises, Inc., for that purpose, and it had been intended that he and Vaughan would be equal shareholders. Vaughan, however, had become involved in other commitments and problems which prevented his joining the enterprise, so Arnold was the sole stockholder and chief officer. The property was taken in the corporate name. Arnold employed Mitchell to assist in the development and sale of the subdivision. One day while he was in Arnold's office Mitchell suggested that they ought to have the terms of this employment in writing. Arnold responded by dictating a letter from Mitchell to Fayette Enterprises, which Mitchell thereupon signed and Arnold, as president of the corporation, received. Here are the pertinent contents of that letter:

"It is my understanding that I will do every thing in my power to aid this development in every way including the selling of the one hundred forty-one lots, more or less, for a price equal to twenty (20%) percent of the net profits after the costs of the land and development have been paid.

"I realize that we have a definite understanding concerning my part of this development, but I am giving you this letter in order that you may have something for your file."

Arnold and Fayette Enterprises contend that in arriving at the net figure to which Mitchell's 20% is to be applied the corporation is entitled to charge the corporation's income taxes and Arnold's $18,000 per annum salary as president.[3] The Master Commissioner concluded that the taxes were a proper charge but that the salary was not. Both sides appeal.

The letter constitutes the agreement. It was composed by Arnold himself, an able attorney. There is no latent ambiguity requiring extrinsic evidence to unveil its meaning. Neither is it ambiguous on its face. We understand what the term "net profit" is usually taken to mean, but with all due respect to Webster's definition,

---

3. Though it is not a factor essential to the decision of this question, Mitchell had no knowledge of the salary.

Webster does not undertake to define the expression, "net profits after the costs of the land and development have been paid." If it means "net profits," no more and no less, the clause "after the costs of the land and development have been paid" has no meaning. Why, then, was this clause added? We think the answer is unavoidable. Its purpose was to qualify the term "net profits," and that purpose can be achieved only if "costs of the land and development" are construed to mean direct costs, as distinct from such indirect charges as administration, selling expenses, and income taxes.

It is our conclusion that the disallowance of the salary as a proper charge was correct and the charging of income taxes was incorrect.

### Cardinal Valley Subdivision

 In 1957 Fayette Enterprises purchased a tract which became Cardinal Valley Subdivision. Mitchell was given an exclusive agency to sell the lots. His commission was to be 3% of the gross sales. This agreement was oral, hence subject to the statute of frauds, KRS 371.010(8), which was interposed as a defense against his claim on the express contract. However, his complaint stated an alternative claim on quantum meruit for the equivalent of 5%. The statutory defense against the express contract was sustained, but a recovery of 2% of the gross sales was adjudged on quasi-contract. The only objection to this solution raised on appeal is Mitchell's contention that he should have received at least 3% instead of 2%, since Fayette Enterprises had, by way of an attempted estoppel against his quasi-contract claim for 5% alleged and admitted the oral 3% agreement.

The recovery having been allowed on quasi-contract, and there being no contention that it should have been based on the express contract, we do not follow the argument that the express agreement fixes the value of the services for purposes of the implied agreement. It was brought out in the testimony that 5% is the ordinary commission for a non-exclusive agency to sell real estate and that 3% is the going rate for an exclusive agency in a new subdivision. There was a sharp conflict in the evidence as to whether Mitchell or Arnold was the moving force in the sale of 15 of the 18 lots. We think the Master Commissioner's solution in allowing Mitchell 2% on all of the lots was reasonable and certainly not a clearly erroneous determination of the value of his services. He could just as well have been awarded 5% on three of the lots and nothing on the others.

The judgment in Civil Action 8350 is affirmed. The judgment in Civil Action 8349 is affirmed on the direct appeal and reversed in part on the cross-appeal of the appellee Mitchell with directions that the amount of recovery awarded him against Fayette Enterprises, Inc., be revised in accordance with this opinion.

BIRD, J., not sitting.