**FIRST SECURITY NATIONAL BANK & TRUST COMPANY OF LEXING-TON, etc., Appellant,**

v.

**Edward H. PETER et al., Appellees.**

Court of Appeals of Kentucky.

June 12, 1970.

Elwood Rosenbaum, Rosenbaum & Smith, Lexington, for appellant.

Arthur L. Brooks, Jr., J. Montjoy Trimble, Kincaid, Wilson & Trimble, Lexington, for appellees.

STEINFELD, Judge.

Appellant, First Security National Bank & Trust Company of Lexington, was ap-pointed liquidating agent for George Frank-lin Vaughan, Jr. (hereinafter Vaughan) in an arraignment proceeding under Chapter 11 of the Bankruptcy Act. It was ordered to enter into an option contract with ap-pellee, Edward H. Peter, for the sale of certain real estate. When a title insurance company declined to insure the title free of restrictions this suit was brought as a class action for a declaration of rights to determine whether the property was en-cumbered. The other appellees are the owners of land in the area affected by the controversy. The trial court found that this land was " * * * limited to single family residences with garage attached," and that the bank could not convey the title free of restrictions. From that judg-ment the bank has appealed. We affirm.

In 1939 Vaughan became the owner of a tract of land containing approximately 136 acres located at the intersection of Mason Headley and Versailles Roads in Fayette County. He received from his vendor, the Mason Foundation, an unrecorded plat showing a subdivision of part of the land acquired. The building lots were desig-nated by numbers. Between 1939 and 1950 Vaughan, without imposing restrictions, conveyed two tracts, one to Cardinal Hill Convalescent Home and the other to Psy-chiatric Associates. The convalescent home tract is at the corner of the two roads. In 1950 or 1951 Vaughan built a large sin-gle-family dwelling on land next to the convalescent home and fronting on Mason Headley Road. His residence tract con-tains 10 acres and is referred to by Vaughan as a baby farm. This tract is the subject of this litigation. We will refer to it as the "home place".

On December 5, 1952, Vaughan conveyed to Elton A. Whitmore and wife a lot having 150 feet of frontage on Mason Headley Road and a depth of 235 feet. It is about 250 feet from the home place. In the deed the land was described by metes and bounds and was referred to as "Lot No. 3, Unit No. One, in the Cardinal Hill Sub-division to the City of Lexington, Fayette

County, Kentucky", the same lot number as indicated on the plat he received from his vendor. This deed contained the following language:

"This conveyance is made subject to the following restrictions, which shall be covenants running with the land, and shall be binding on the heirs, assigns, and successors of the parties hereto:

FIRST, the purpose of these restrictions is to limit the use and occupancy of any one lot to a single family residence with garage attached, either to the main body of the residence or by a porch or by a breezeway. Dwelling to be occupied by the purchaser or his lessee; and to contain not less than fourteen hundred (1400) square feet of floor space on the ground floor exclusive of the garage, on all lots facing the *Mason Headley Road,* and twelve hundred (1200) square feet of floor space on all other lots in this subdivision, and is to be of masonry construction and all appurtenances to the main residence shall be of a cost, architecture and construction, appropriate to and in harmony with the main residence.

SECOND, no building or appurtenance hereto shall be erected closer than one hundred (100) feet to the Mason Headley Road or closer than fifty (50) feet to any other streets, lot line in this subdivision, and no building or appurtenance thereto shall be erected closer than six (6) feet to any other lot boundary line.

THIRD, the plans of the main residence and all appurtenances to the main residence must be approved by the seller or his duly authorized representative.

FOURTH, refuse, ashes, garbage and debris of all kinds shall be cared for in such a way as not to be a nuisance.

FIFTH, an easement over a strip eight (8) feet wide next to and across the rear end of the property sold, to carry electric light, power, and telephone lines or any of them across said property, and the right is hereby reserved to enter upon said property at any and all reasonable times for the purpose of installation and maintenance of said structure, said electric light and power lines shall be installed at the expense of the seller.

SIXTH, It is understood and agreed that the seller is to extend the city water and gas mains in front of each lot in Unit No. One of the Cardinal Hill Subdivision, at the expense of the seller."

On April 4, 1953, Vaughan conveyed to William K. Davidson and wife a lot on Mason Headley Road of the same size as the one transferred to the Whitmores. It is about 780 feet from the home place. The deed described the property by metes and bounds, and referred to the land as "Lot No. 7, Unit No. One in the Cardinal Hill Subdivision, of the City of Lexington * * *", the same number indicated on the original plat. That deed contained the same restrictions and provisions as the conveyence to the Whitmores.

In May 1953 Vaughan filed with the planning and zoning commission a "Preliminary Plat for Cardinal Hill Subdivision." It showed 92 building lots having approximately an average width of 95 feet and an average depth of 250 feet. Some faced the Mason Headley Road and others the planned streets. The home place, which has never been included in any approved or recorded subdivision plan, was shown on this plat. The only subdividing indicated for the home place was a lot in its southwest corner, designated as number one, with 154 feet of frontage on the Mason Headley Road and a depth of 235 feet, and four lots numbered 33 through 36, inclusive across the eastern portion. The plat showed a proposed street, Wolf Run Drive, separating those four lots from the remainder of the home place. The proposed Wolf Run Drive extends from the convalescent home land to a point 200 feet from the eastern boundary of the Vaughan tract, and it runs generally parallel to the Mason Headley Road.

The submitted plat indicated the proposed use of the property to be for a residential subdivision and on it appeared "PRIVATE RESTRICTIONS".

"Limited to single-family residence with garage attached

1400 sq. ft. minimum floor space fronting Mason Headley Road

1200 sq. ft. min. floor space on all other lots

Masonry construction

Plans must be approved by owner."

The owner's signature was affixed below the street dedication and there is a statement with respect to a sewage disposal system. On this plat which was never approved or recorded appears the name Elton Whitmore on lot number 3 and the name of W. K. Davidson on lot number 7.

Vaughan conveyed a building lot fronting on Mason Headley Road to Roscoe Sacra on June 13, 1953, describing it by metes and bounds and referring to it as "Lot No. 8, of Cardinal Hill Subdivision, Unit No. 1 * * *". The deed recited " * * * this conveyance is made subject to any restrictions which may be a matter of record, just as if they were set out at length herein."

On June 25, 1953, Cardinal Hill Development Corporation was incorporated[1] and Vaughan became the major stockholder and president. It was formed by Vaughan to develop and subdivide the land. The corporation acquired from Vaughan all the remaining land except the home place. The conveyances from Vaughan to the corporation made no mention of restrictions. The planning and zoning commission on June 30, 1953, approved a plan submitted by the corporation for Unit No. 1 of Cardinal Hill Subdivision, in 1954 it approved a plan for "Cardinal Hill

Subdivision, Unit Two" and in 1955 for "Unit Three". The plats for all units restricted use of the lots to a single-family dwelling of certain specified minimum size.

Vaughan, together with Cardinal Hill Development Corporation, on September 3, 1959, conveyed to Leo Larmour and wife a building lot located on Mason Headley Road. The deed described the land by metes and bounds and as "Lot No. 9, in Unit 3 of the Cardinal Hill Subdivision * * * as shown by map or plat of record in the office of the Fayette County Clerk in Plat Book 5, page 98."[2] The deed contained the same restrictions as those in the one to Whitmores.

By a deed dated July 30, 1964, Vaughan individually and his corporation conveyed to James C. Ball and his wife a building lot fronting on Duntreath Drive in unit number three. That lot adjoined the home place. Ball required land not embraced in the platted lot so Vaughan joined in the conveyance to include a small part of the home place. The deed to Ball described the land by metes and bounds and contained the same restrictions above quoted.

There is nothing in the record before us which indicates that the land along Mason Headley Road was ever incorporated into an approved subdivision, except three lots near the southeastern boundary of the original tract. We are not supplied with information regarding conveyances of the other lots along that road or if any restrictions have been imposed on them.

Neither Vaughan nor the corporation covenanted that the home place would be restricted. No witness testified that Vaughan made any representations with respect to restrictions on the home place. The only statements attributed to Vaughan were that he had no plans for the property and intended to continue to live in the home. Two owners of lots in the approved

---

1. For additional facts see Arnold v. Mitchell, Ky., 377 S.W.2d 799 (1964).

2. Exhibit N shows Cardinal Hill Subdivision, Unit 3 to be in another area and lot No. 9 a different lot.

subdivision stated that at the time they purchased they had the impression that the home tract someday would be subdivided into single-family residential lots.

The trial court held that there was a general scheme for developing the Vaughan land including that part optioned to Peter, therefore, it adjudged that under the reciprocal negative covenant doctrine the use of the home place was restricted to the erection of single-family dwellings having the same minimum floor space requirements as those in the other areas. That doctrine was stated in Rieger v. Wessel, Ky., 319 S.W.2d 855 (1958), as follows:

"If the owner of two or more lots, so situated as to bear the relation to a general scheme of development, sells one with an easement of benefit to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained can do nothing forbidden to the owner of the lot sold. For want of a better descriptive term this is styled a reciprocal negative easement. It runs with the land sold by virtue of the express burden placed upon it and abides with the land retained until loosened by expiration of its period of service or by events working its destruction. It is not personal to the owner but operative upon the use of the land by any owner having actual or constructive notice thereof. (citing cases)."

Also see Sanborn v. McLean, 233 Mich. 227, 206 N.W. 496, 60 A.L.R. 1212 (1925); 21 A.L.R. 1306 and 20 Am.Jur.2d 732, Covenants, § 173. Rieger also holds that whether the owner has intended to impose a general plan for the development of the land " * * * must be determined as of the time the subdivision was platted and lots were first sold therein."

It is written in 20 Am.Jur.2d 733, Covenants, Conditions, etc., § 173 that:

"It is said that the essential elements for proof of reciprocal negative ease-ments are a common grantor, a general plan or scheme of restriction, and restrictive covenants running with the land, in accordance with such plan or scheme and within the plan or scheme area in deeds granted by the common grantor. That is, in order for a reciprocal negative easement to arise, there must have been a common owner of the related parcels of land, and in his various grants of the lots he must have included some restriction, either affirmative or negative, for the benefit of the land retained, evidencing a scheme or intent that the entire tract should be similarly treated, so that once the plan is effectively put into operation, the burden he has placed upon the land conveyed is by operation of law reciprocally placed upon the land retained."

The bank insists that the evidence does not demonstrate a scheme to restrict the home place, and that the evidence is to the contrary. It notes that conveyances to the corporation, convalescent home and to the Psychiatric Associates contained no restrictions. The three plats which were recorded did not show the home place and no covenant or representation indicated that it was or would be encumbered. The subdividing was by the corporation, not Vaughan. The bank also points out that the activities of Vaughan and the corporation occurred over many years and that there was not a specific time, as required by Rieger, when the subdivision was first "platted and lots were first sold therein."

■ Appellant argues, and we agree, that the doctrine of reciprocal negative easement should be applied with extreme caution. McCurdy v. Standard Realty Corporation, 295 Ky. 587, 175 S.W.2d 28 (1943), 20 Am.Jur.2d 735, Covenants, Conditions, etc., § 173. Also see Stowe v. Briggs, Ky., 451 S.W.2d 152 (1970). Appellant quotes from 144 A.L.R. 916 which states that " * * * the mere fact that a grantor imposes restrictions upon a lot conveyed, with respect to the manner of using or subdivid-

ing the lots, raises no inferences or implication that the remainder of his property, not covered by the conveyances will be similarly restricted." It calls our attention to the fact that the preliminary proposed plat which was rejected by the zoning board was never put to record and never examined by any of the appellees with the possible exception of one, and that the conveyances to Whitmore, Davidson, Sacra and the corporation, and the subdividing occurred some twelve to fourteen years before the option was granted to appellee Peter. Appellant relies on McCurdy v. Standard Realty Corporation, 295 Ky. 587, 175 S.W. 2d 28 (1943) and Galbreath v. Miller, Ky., 426 S.W.2d 126 (1968). McCurdy involved a claim that restrictions on section one of a subdivision applied to land later platted as section number two. We said:

> "The appellant's case is deficient, it seems to us, in respect to the time and character of the representations claimed to have been made, and weak in respect to notice or knowledge of the purchaser, the appellee, Standard Realty Corporation, when it bought all of Section No. 2. To create the burden of an equitable or implied restriction by reason of a general plan and scheme, it must have been annexed by a contemporaneous, enforceable agreement."

In Greer v. Bornstein, 246 Ky. 286, 54 S.W.2d 927 (1932), we held that the evidence established a general scheme but in Galbreath we found a general scheme to restrict was absent. Here there were conveyances by Vaughan to the convalescent home, the associates and to the corporation without imposing restrictions. The deeds to the corporation warranted the land conveyed to be free of encumbrances. The area was and is protected by its zoning. On the other hand the transfers to Whitmore, Davidson, Sacra, Larmour and Ball all imposed restrictions on the land conveyed, but there was no express promise by Vaughan "to insert similar covenants and restrictions in deeds covering lots in

the same subdivision." Cf. Brueggen v. Boehn, Ky., 344 S.W.2d 404 (1961). The acts of his corporation implemented the scheme and was consistent with it.

We observed in McFarland v. Hanley, Ky., 258 S.W.2d 3 (1953), that " * * * covenants restricting building and the use of land * * * have been * * * denominated * * * as mutual, reciprocal, equitable easements of the nature of servitudes in favor of owners of other lots of a plot of which all were once a part." The doctrine of "reciprocal negative covenant" emerged to afford protection to land when that appears essential.

It is elementary that "The law favors the free and unrestricted use of property, resolving doubts and ambiguities in favor thereof. Equity will not infer a negative covenant, except where equity and justice requires * * *". 21 C.J.S. Covenants § 19, p. 895. Reciprocal covenants " * * * are not favored, and will not be aided or extended by implication." Stevenson v. Spivey, 132 Va. 115, 110 S.E. 367, 21 A.L.R. 1276. Jernigan v. Capps, 187 Va. 73, 45 S.E.2d 886, 175 A.L.R. 1182 (1947), quoted from an earlier case saying:

> " * * * while courts of equity will enforce restrictive covenants where the intention of the parties is clear and the restrictions are reasonable, they are not favored, and the burden is on him who would enforce such covenants to establish that the activity objected to is within their terms. They are to be construed most strictly against the grantor and persons seeking to enforce them, and substantial doubt or ambiguity is to be resolved in favor of the free use of property and against restrictions. (citing authorities)."

"The question of the existence of a general plan is one of fact, to be determined with reference to the particulars and conditions of the laying out and sale of the lots,

as indicated either verbally or in writing." 3 Tiffany Real Property, 3rd Ed. 505, section 868. Also whether Vaughan intended that the restrictive covenants placed by him and his corporation on the land conveyed and subdivided should affect his retained land as part of the general scheme of development is a question of fact. Scholtes v. McColgan, 184 Md. 480, 41 A.2d 479 (1945).

The chancellor found that there was a general scheme to restrict and that this plan included the home place. There was sufficient probative evidence to support this conclusion, therefore, we will not disturb it. CR 52.01. Justice v. Justice, Ky., 421 S.W.2d 868 (1967).

The judgment is affirmed.

All concur.