The **BELLEMEADE COMPANY** et al., Appellants,

v.

Dr. Harold D. **PRIDDLE** et al., Appellees.

Court of Appeals of Kentucky.

Sept. 28, 1973.

As Modified on Denial of Rehearing
Feb. 1, 1974.

W. Pelham McMurry, Paducah, for The Bellemeade Co. and Owners.

Samuel S. Boaz, Paducah, for Paducah Planning Commission.

J. William Howerton, Paducah, for City of Paducah and Bd. of Commissioners of the City of Paducah.

William B. Byrd, Paducah, for appellees.

STEINFELD, Justice.

Appellee Dr. Harold D. Priddle and his neighbors are owners of residential lots in Sections I, II, III or IV of Bellemeade, approved and recorded sections of a subdivision. On an appeal and a petition for a declaration of rights they obtained a circuit court judgment setting aside certain acts of the Paducah Planning and Zoning Commission and enjoining it from " * * * further proceedings in connection with the pending application by * * *" appellant, The Bellemeade Company, its owners and developers (hereinafter developers) " * * * for approval of the proposed neighborhood development unit and for approval of the construction of the proposed Holiday Inn motel * * * on Section V of Bellemeade Subdivision * * *." That section contained

twelve acres adjacent to Lone Oak Road (U. S. Highway 45). The developers also were enjoined " * * * from taking any further action in connection with * * *" those applications or to put the property to " * * * uses other than one-family residential uses thereon, as a result of or based upon the Planning Commission's * * * actions * * *." From that judgment the developers have appealed. We reverse.

Although zoning restrictions and deed restrictions are independent of each other,[1] a burning issue raged throughout this litigation as to whether Section V is encumbered by restrictive covenants. Relying on First Security National Bank & Trust Company of Lexington v. Peter, Ky., 456 S.W.2d 46 (1970), the trial court, in its findings of fact (CR 52.01) and conclusions of law, said that Section V was embraced by the deed restrictions which went to record as each of the first four sections were approved. The judgment did not make this declaration but the conclusions of law stated "Since findings of fact have been made herein which support the plaintiffs' contention that the 'reciprocal negative covenant doctrine' would apply, it is concluded that said actions by the Planning Commission on August 5, 1970, December 2, 1970, and December 16, 1970, are null and void by reason of the application of said doctrine to the facts in this case." The parties have treated this conclusion as if the judgment had declared that Section V was restricted so that it may " * * * be used for one-family residential purposes only and no commercial or professional activities shall be conducted on the premises." The developers argue that if this " * * * finding is upheld by this Court the twelve (12) acres involved in this litigation will be rendered completely useless."

All parties rely on statements made in First Security National Bank & Trust Company of Lexington v. Peter, supra. There we quoted from 20 Am.Jur.2d, Covenants, Conditions, Etc., Sec. 173, p. 733, as follows:

" * * * in order for a reciprocal negative easement to arise, there must have been a common owner of the related parcels of land, and in his various grants of the lots he must have included some restriction, either affirmative or negative, for the benefit of the land retained, evidencing a scheme or intent that the entire tract should be similarly treated, so that once the plan is effectively put into operation, the burden he has placed upon the land conveyed is by operation of law reciprocally placed upon the land retained."

The developers deny emphatically that any restriction, act or deed indicated a scheme or intent that their entire tract should be similarly treated.

In 1960 the developers negotiated with an organization to develop Section V commercially, and in 1963 that property was optioned for the construction of a retirement home complex. Negotiations for the erection of a motel and restaurant were carried on in 1966, and in 1967 an option was granted to an oil company to build an automobile service station. The owners employed an architect in 1968 to draw up preliminary plans for the erection of a motel and shortly thereafter a contract was entered into with a franchise holder to build and operate a motel on that section.

At the time the subdivision plat of Section I went to record there was in existence a contract with a real estate firm, by the terms of which it was given the exclusive right to sell the residential lots and included also was a separate provision giving those agents " * * * the exclusive rights to sell, lease or develop the property facing the Lone Oak Road (Section V) owned by the party of the first part which is described in the plat dated December 3, 1952, as multi-family, duplex housing, shopping center and parking area." On

---

1. See discussion in 20 Am.Jur.2d, Covenants, Conditions, Etc., Sec. 277, p. 837, citing several Kentucky cases.

November 10, 1959, the owners entered into a covenant of restrictions which applied to all lots in Section I through IV except for six lots. It provided that the land in those sections: "* * * shall be used for one family residential purposes only and no commercial or professional activities shall be conducted on the premises." It provided as to the type of construction, the size and the set-back requirements and it stated "* * * that these restrictions constitute covenants running with the land which will be binding upon all future owners of property within the limits of the heretofore described portion of Bellemeade Subdivision." It was stipulated by the parties to this litigation that "At all times during the development and marketing of the lots on the * * * four sections of Bellemeade there were in * * * effect * * * covenants of restrictions as set forth in the indenture of covenants and restrictions dated November 10, 1959 * * *." No plat in the record showed that the subject property was restricted in any way or that it was reserved for any particular purpose.

A large sign was posted on Section V so that it could be seen from a main highway. On the sign appeared the agent's name and the words "Build your Home in Bellemeade. City Schools. Large Lots. Protective Restrictions. City Water. Natural Gas." Some purchasers of Bellemeade lots were handed a printed sheet by the real estate agents which was headed "Bellemeade Building Restrictions." It contained the statement that "All parcels shall be used for one family residential purposes only and no commercial or professional activities shall be conducted on the premises." These sheets did not specify to what area they applied. The record is silent as to what explanation, if any, was made at the time the sheets were delivered to the purchasers of lots. However, there is no proof that any of the lots in Section V were offered for sale for residential purposes. Additional contra evidence showed a series of events before 1959 which clear-ly indicated the intent of the developers to use Section V for commercial purposes. For instance, in 1952 there were negotiations for the construction of a Woolworth Shopping Center and in 1958 an option for still another shopping center was given, which latter project was announced in the Paducah Sun Democrat, a newspaper of general circulation in that area. It is our opinion that the sign and the printed sheets referred to were not calculated to deceive the purchasers nor did this or any other evidence or stipulation furnish sufficient basis on which the trial court reasonably could find that the restrictive covenants embraced Section V.

We distinguish the facts in the present litigation from those in First Security National Bank & Trust Co. of Lexington v. Peter, supra, in that the activities of the developers of the property in that case created great confusion as to just what land the restrictive covenants covered. We find no evidence showing confusion in this case; furthermore, the recorded restrictions, having used the words "* * * within the limits of the heretofore described portion of Bellemeade Subdivision," of which all purchasers had at least constructive knowledge, made the area of their application perfectly clear. These expressions must "* * * be strictly construed and given the effect which the language in which they are expressed authorizes when considered in connection with the circumstances surrounding the transaction and the objects which the parties had in view at the time of their creation." Foos v. Engle, 295 Ky. 114, 174 S.W.2d 5 (1943). Also see LaVielle v. Seay, Ky., 412 S.W.2d 587 (1966). Those who contend that the restrictive covenants apply to Section V had the burden of showing by clear and convincing evidence that they so apply. Vittitow v. Dodson, 302 Ky. 418, 194 S.W.2d 996 (1946); 21 C.J.S. Covenants § 19, p. 896. They have failed to do so.

The reciprocal covenant doctrine must be applied with extreme caution.

McCurdy v. Standard Realty Corp., 295 Ky. 587, 175 S.W.2d 28 (1943). It is our opinion that the statement appearing in 144 A.L.R. 916 is applicable. It reads in pertinent part:

"The mere fact that a grantor imposes restrictions upon a lot conveyed, with respect to the manner of using or subdividing the lots raises no inferences or implications that the remainder of his property, not covered by the conveyance, will be similarly restricted."

See Galbreath v. Miller, Ky., 426 S.W.2d 126 (1968). We hold that the evidence did not support a finding that Section V was embraced by the restrictive covenants under the "reciprocal covenant doctrine" or at all. Cf. Vittitow v. Dodson, supra.

The application which appellant made to the Paducah Planning Commission pursuant to section 13 of the 1961 zoning ordinance precipitated this litigation. That section authorized the Planning Commission to establish a neighborhood development unit which, in "zoning" parlance, is frequently referred to as a "floating zone." "The phrase 'floating zone' has been coined to designate a method of zoning whereby selected uses of property are authorized in districts devoted to other uses under terms and conditions laid down in the ordinances themselves." Zoning Law and Practice, Yokley, 3d Ed., p. 133, Sec. 3.7. A floating zone is differentiated from a fixed ("Euclidean") zone in that the latter is a specifically defined area under the zoning ordinance, while the boundaries of the former are undefined and it "floats" over the entire district until by appropriate action the boundaries are fixed and it is anchored. Furthermore, it is the landowner who instigates the procedure which results in the settling of the floating zone. Bigenho v. Montgomery County Council, 248 Md. 386, 237 A.2d 53 (1968).

In the trial court the appellees contended, and they now argue, that section 13 of the ordinance is invalid because it violates section 156 of the Kentucky Constitution and our statutes; also that it is contrary to our case law. That court declared that it was unnecessary for it to pass on this issue because of other conclusions it reached, but since we do not concur in those conclusions it is necessary for us to resolve this contention.

The several courts which have been confronted with this question have sought to determine whether reserving to the legislative body or granting to an administrative board the authority to locate a "floating zone" complied with the statutory requirement that a comprehensive plan be adopted. The principle of floating zones was upheld in Sheridan v. Planning Board of Stamford, 159 Conn. 1, 266 A.2d 396 (1969); Rodgers v. Village of Tarrytown, 302 N.Y. 115, 96 N.E.2d 731 (1951); Beall v. Montgomery County Council, 240 Md. 77, 212 A.2d 751 (1965); Bigenho v. Montgomery County Council, 248 Md. 387, 237 A.2d 53 (1968); and Orinda Homeowners Committee v. Board of Supervisors, 11 Cal.App.3d 768, 90 Cal.Rptr. 88 (1970). In Millbrae Assn. v. Millbrae, 262 Cal.App.2d 222, 69 Cal.Rptr. 251 (1968), the court noted that once established the planned unit development district constitutes a separate zoning district.

■ KRS 100.183 through 100.197 provide for the preparation and adoption of a comprehensive plan by each planning unit. We said in Ward v. Knippenberg, Ky., 416 S.W.2d 746 (1967), that the land use plan " * * * serves as a guide rather than a straitjacket", and that the plan is subject to modification. We note nothing in those statutes which indicates that a planned neighborhood development unit (floating zone) is impermissible. On the contrary, they suggest that flexibility is expected. Furthermore, KRS 100.203(1)(e) authorizes cities to provide for a varied assortment of districts. The pertinent part of that statute reads:

"Cities * * * may exercise the power to zone through zoning regulations which shall contain: * * * Dis-

tricts of special interest to the proper development of the community, including, but not limited to, exclusive use districts, historical districts, planned business districts, planned industrial districts, renewal, rehabilitation, and conservation districts; planned neighborhood and group housing districts; * * *."

It is our opinion that the expressions contained in the foregoing statutory language are sufficiently broad to authorize a city to provide for neighborhood development units.[2]

In this state special uses have been allowed for many years under ordinances or regulations providing therefor. We held in Hofgesang v. McMakin, Ky., 457 S.W. 2d 950 (1969), that "There is ample statutory authority for the 'special uses' section of the regulation." How could we then say that floating zones are inimical to the comprehensive plan?

We reject the argument that Kentucky Constitution, section 156, is violated in that there is no general law which authorizes the City Commission of Paducah to delegate to the Planning Commission the authority to locate a "floating zone." KRS 100.193 and KRS 100.197, when read together, are sufficiently broad to allow the procedure provided for in section 13 of the Paducah zoning ordinance.

■ Appellees charge that section 13 is a delegation by the city legislative body to the Planning Commission of a legislative function and, therefore, is contrary to law. They cite Bray v. Beyer, 292 Ky. 162, 166 S.W.2d 290 (1942), which held that the Board of Adjustment may not authorize a use of land not prescribed for that area by the zoning ordinance, although when authorized by law it may grant special exceptions and variances only under exceptional circumstances. We find that the rationale of the Bray case does not apply inasmuch as here the Commission did not attempt to

grant a use which the ordinance did not authorize, and we hold that the Paducah lawmakers did not abdicate their function in favor of the Commission. The great body of administrative law has developed out of the necessity to provide a method for the implementation and execution of legislative policy. Under the guidelines established by the city legislative body in section 13, the Commission was given the authority to authorize neighborhood development units in certain areas. We find no illegal delegation of a legislative function.

The ordinance stated that one of the purposes of section 13 was "to establish a more flexible procedure for the approval by the Commission of development plans for large tracts of land * * *." It provided that neighborhood development units could be established in housing, shopping centers and light manufacturing districts, but it fixed the minimum number of acres allowable in each zone. It specified the procedure to be followed by the Commission as it processed, considered and acted upon an application. It enabled the Commission to intelligently, systematically and carefully consider the zoning plan application and, on the basis of those studies, permit a development which would be compatible with the zoning objectives. Cf. Fritts v. City of Ashland, Ky., 348 S.W.2d 712 (1961).

■ Appellees argue that section 13 authorized the Planning Commission to grant variances and that variances are exclusively within the power of the Board of Adjustments and even that board is prohibited by KRS 100.247 from authorizing "* * * a use * * * which is not permitted by the zoning regulation in the zone in question." Appellees continue, "* * * if Section 13 purports to give to the Planning Commission the power to authorize an otherwise prohibited use within a zone, then it flagrantly violates the requirement of KRS 100.203(1) that regula-

2. See Kentucky Planning and Land Use Control Enabling Legislation, etc., Tarlock, 56 Ky. L.J. 556, at p. 598.

tions be uniform within a zone." We respond that a floating zone is not a prohibited use nor is authorizing one the granting of a variance.

In Chatham Corp. v. Beltram, 243 Md. 138, 220 A.2d 589 (1966), the court defined a floating zone as " * * * a special detailed use district of undetermined location, a district in which the proposed kind, location, size and form of structures must be pre-approved, and which, like a special exception use, is legislatively pre-deemed compatible with the areas in which it may thereafter be located on a particular application, provided specified standards are gratified and actual incompatibility is not revealed."

■ Appellees contend that section 13 of the ordinance is void for the lack of standards. This section permits units in only three of the zone classifications and it fixes minimum size areas and specifies under what circumstances they may be allowed. It authorizes approval after a public hearing and an affirmative finding that:

"(1) The proposed neighborhood development unit is compatible with the objectives of the master plan and the spirit of this Ordinance; and

"(2) The requirements of this Ordinance, as modified by this section, and, for a shopping center in a B–5 zone the requirements of Section 26, will be met, and

"(3) The plans for such neighborhood development unit indicate compliance with the requirements of other ordinances of the city."

We are of the opinion that such reasonably explicit regulations as are necessary to a just and proper administration of the ordinance are provided. See Fox v. Adams, Sup., 134 N.Y.S.2d 534 (1954).

■ The trial court found that the proposed use did not serve neighborhood needs; that it was not harmonious with its character, and that the Planning Commission acted arbitrarily and unreasonably. Section 13 of the ordinance directs the Commission to review the application and the supporting material to determine what effect the proposed development will have on the master plan. The Planning Commission conducted several public hearings. The opposing parties were represented by counsel who made comprehensive statements and furnished exhibits to the Commission. The Commission members asked questions, cross-examined speakers and received answers. Although the witnesses who spoke were not sworn, many stated reasons why they felt it improper to grant the proposal. All were given a full opportunity to express themselves and to refute and contradict those who expressed contrary views. This procedure sufficiently constituted trial-type hearings as referred to in City of Louisville v. McDonald, Ky., 470 S.W.2d 173 (1971), under the circumstances presented here. The findings made by the Planning Commission were supported by substantial evidence as shown by the record of the proceedings. At the final meeting the Planning Commission found " * * * that a proposed neighborhood development unit for the area in question is compatible with the objective of the master plan and the spirit of this ordinance * * *." It is our opinion that its actions erroneously were labeled arbitrary and unreasonable. Leutenmayer v. Mathis, Ky., 333 S.W.2d 774 (1959).

On the basis of the ordinance chancellor concluded that the applicant had to furnish " * * * engineering, architectural and landscape architectural plants for the development of the tract as a whole * * *." Section 13, in pertinent part, provides:

"(c) Procedure. Upon receipt of an application for a neighborhood development unit, including engineering, architectural and landscape architectural plans therefor, the Commission shall review the proposed development as to its effect upon the master plan. * * *"

The developers filed with their application, a plot, a landscape plan, and a development section by section of what they intended to do for the whole area. The developers also filed with this application a letter pledging that each building would be constructed from the same materials and bear a definite stamp of being part of one unit. This letter further detailed the type of architecture, lighting, landscaping and entrances and exits for the development. The minutes of the August 5, 1970, meeting of the Planning Commission reveal that the following occurred:

"By the Chairman:

In the matter of the application of Bellemeade Company for approval of a proposed Neighborhood Development Unit to be located at the intersection of U.S. Highway 45 and Kennedy Road, a public hearing now having been held, I move that because of the estimated expense of approximately $25,690.00 which will be required in the preparation and submission of the engineering and architectural plans, the filing of such plans at this time be waived; that it be the finding of this Commission that a proposed Neighborhood Development Unit for the area in question is compatible with the objective of the Master Plan and the spirit of this ordinance; that this Commission at this time approve the area shown on the plan attached to the application as to its suitability for development as a Neighborhood Development Unit, to including the following uses:

1. Drug store

2. Supermarket

3. Motel

4. Townhouses

5. Restaurant

6. Service station

7. Other retail establishments as approved by this Commission;

that it be the further determination of this Commission that no development of said proposed Neighborhood Development Unit shall be permitted nor shall any such development take place without the submission of final engineering, architectural and landscape architectural plans, therefor; that following the submission of engineering and architectural plans this Commission shall proceed with another public hearing following notice duly published and that following such further public hearing the requirements of Section 13 C 2 and C 3 shall then be determined.

THE MOTION WAS VOTED ON BY THE ENTIRE BOARD AND WAS CARRIED. THE FOREGOING MOTION IS ADOPTED."

At the December 16, 1970, public meeting of the Planning Commission " * * * the engineering, landscape architectural drawings of Section B, Bellemeade Village Neighborhood Development Unit, which the developer had submitted in accordance with the approved development plan" were discussed and considered. The minutes indicate that the Planning Commission acted as follows:

"Mr. Kerr:

The matter of the application of Bellemeade Company for approval of Section B, Neighborhood Development Unit, to file final engineering, architectural and landscape plans, now having been held in pursuant to public notice, I move the public hearing be closed and that this application be continued to a future date, the following re-submission of plans based upon the general alteration amendment suggested by this commission and reduced to writing, the public hearing to be announced by public notice.

(Members of the commission voted aye with exception of Commissioner Lee, who voted nay.)

The hearing was adjourned."

Appellees attack this action of the Commission by arguing that the type of unitary development proposed by the owners of the land is impermissible. They say that the entire area designated as a neighborhood development unit must be planned initially to embrace the entire area of the unit and that it must be developed and built as a whole in accordance with the overall plans, which must be approved before a spade is turned. Otherwise, they say a nonconforming use may exist if piecemeal development is permitted. The ordinance provides that "When such approval has been granted, building permits and certificates of occupancy shall be issued in conformance with such approved plans, * * *." It appears to us " * * * that there is no real danger of any material departure from the requirements of the * * *" submitted plans or the permits issued pursuant thereto. Cf. Wells v. Fiscal Court of Jefferson County, Ky., 457 S.W.2d 498 (1970). Appellees refer us to no law indicating that greater protection is legally required. Furthermore, man has not devised a method of preventing impractical economic dreams or satisfactory means of avoiding the interruption of business ventures.

 In Miller v. Planning Commission of City of Torrance, 138 Cal.App.2d 598, 292 P.2d 278 (1956), it was pointed out that the zoning ordinance required the applicant to file with his application "complete plans and description of property, and proposed use, with ground plans and elevations for all proposed buildings." In rejecting an attack on the approval given by the Planning Commission, the court wrote:

"Petitioner asserts he had been denied procedural due process and equal protection of the law. His thesis here is that Halverson's application was not accompanied by complete plans and evidence of his ability and intention to proceed with actual construction within six months from date of approval as provided by section 16D of the ordinance. The fur-

nishing of such information *with the application* is not made a condition, either expressly or by implication, of its approval. These provisions are clearly directory and simply specify a proper time and occasion for supplying this information. If it is furnished prior to the action of the Planning Commission the purpose of the ordinance has been satisfied, for no one has been prejudiced. Here, Exhibit C, which is denominated a 'Plot Plan', is part of the application. While this exhibit does not contain detail plans and elevations such as would be shown on a blueprint, it does contain more information than its title would indicate. It was a substantial compliance with the ordinance."

This construction is harmonious with the holding in City of Little Rock v. Andres, 237 Ark. 658, 375 S.W.2d 370 (1964), and the statement in Anderson, American Law of Zoning, wherein it is written:

"Sec. 12.02. Maxims of construction; strict construction. Zoning ordinances 'are in derogation of the common law' and operate to deprive an owner of property of a use thereof which would otherwise be lawful, and should be strictly construed in favor of the property owner.' "

It is compatible with our rulings in Smith v. Howard, Ky., 407 S.W.2d 139 (1966), and Gates v. Jarvis, Cornette and Payton, Ky., 465 S.W.2d 278 (1971). Also see 101 C.J.S. Zoning § 129, p. 884. We hold that the Commission did not violate the ordinance in considering the application and its accompanying plans in the absence of the final plans. It is apparent that the procedure it followed afforded the due process to which all parties were entitled. American Beauty Homes Corp. v. Louisville, etc., Ky., 379 S.W.2d 450 (1964).

The injunction was granted erroneously and must be dissolved. The judgment is reversed, with directions to enter a judgment consistent herewith.

All concur.