CITY OF LITTLE ROCK *v.* ANDRES.

5-3187                                            375 S. W. 2d 370

Opinion delivered February 10, 1964.

[Rehearing denied March 9, 1964.]

*Joseph C. Kemp,* by *John B. Plegge* and *Perry V. Whitmore,* for appellant.

*Rose, Meek, House, Barron, Nash & Williamson,* for appellee.

SAM ROBINSON, Associate Justice. This is a zoning case. The action was filed by appellees, Frederick U. Andres and his wife, Grace, to enjoin the Board of Directors of the City of Little Rock, its employees, commissioners and agencies, from preventing the plaintiffs from using their property at 2115 Broadway, Little Rock, for purposes designated as "F Commercial" by the Little Rock zoning ordinances. The Chancellor granted the relief prayed and the City of Little Rock has appealed.

The property involved is the home of appellees and is located in an area designated in the zoning ordinances of Little Rock as "C-2 Family District." Appellees contend that Broadway in general, and the block in which their property is located in particular, is no longer suitable as a family district. They, therefore, applied to the Little Rock Planning Commission to have the zoning on their property changed to commercial; the Planning Commission denied the request; appellees appealed to the Board of Directors of Little Rock and again the request was denied.

Appellees then filed this suit in the Pulaski Chancery Court, alleging that the refusal of the Little Rock authorities to rezone the property was arbitrary, and placed unreasonable limits on the use of the property; that a "C-2 Family District" bears no definite relation to the health, safety and general welfare of the inhabitants of the area; that the limitation placed on the use of the property deprives the plaintiffs of their property without due process of law in violation of the 14th Amendment to the Constitution of the United States and Article 2, Sec. 8 of the Constitution of Arkansas, and amounts to the taking of private property for public use without compensation in violation of Article 2, Sec. 2 of the Constitution of Arkansas.

The chancellor, in holding that the petition for rezoning should be granted, found as a fact that the action of the Planning Commission and the Board of Directors of Little Rock in refusing to change the zoning on the

property was arbitrary. If the authorities acted arbitrarily in denying the change in zoning, such action is a sufficient reason to grant the relief prayed. *City of Little Rock* v. *Pfeifer,* 169 Ark. 1027, 277 S. W. 883; *City of Little Rock* v. *Bentley,* 204 Ark. 727, 165 S. W. 2d 890.

If the chancellor's finding to the effect that the authorities were arbitrary in not changing the zoning is supported by a preponderance of the evidence, the decree must be affirmed. *City of Little Rock* v. *Garner,* 235 Ark. 362, 360 S. W. 2d 116; *City of Little Rock* v. *Henson,* 220 Ark. 663; 249 S. W. 2d 118; *City of Little Rock* v. *Joyner,* 212 Ark. 508, 206 S. W. 2d 446.

Zoning ordinances are valid only by reason of the police power. Yokley Zoning Law and Practice, Vol. 1, p. 1; *City of Little Rock* v. *Sun Building & Developing Co.,* 199 Ark. 333, 134 S. W. 2d 582. Such ordinances are in derogation of common law and operate to deprive an owner of property of a use thereof which would otherwise be lawful, and should be strictly construed in favor of the property owner. *City of Little Rock* v. *Williams,* 206 Ark. 861, 177 S. W. 2d 924. On the theory and purposes of zoning the courts have said: "The proper purposes of zoning have been said to conserve the value of property and encourage the most appropriate use of land." *Griggs* v. *City of Paterson,* 39 A. 2d 231. One of the main purposes of zoning is the stabilization of property values in a neighborhood. *Libby* v. *Board of Zoning Appeals,* 118 A. 2d 894.

Prior to the erection of the Broadway Bridge across the Arkansas River about 40 years ago, there was no through traffic on Broadway; it was just another residential street. Many of the finest homes in the city were located on Broadway. After the building of the Broadway Bridge and the great development of automobile and truck traffic, Broadway became one of the principal thoroughfares of the nation. It became a link in U. S. Highways 65, 67, 70, 167 and State Highway 5. A large portion of automobile traffic going from the eastern part of the United States to the west, and vice versa, neces-

sarily used Broadway, especially so in the winter months. The traffic count reached 28,000 vehicles per day. (Since the construction of the freeway around Little Rock it is estimated that the count will drop to about 11,000 per day.)

Twenty-five blocks south of the Arkansas River Broadway intersects Roosevelt Road. All of the through highways of which Broadway is a part go either to the east or west on Roosevelt.

Years ago all of Broadway south of the river to about 13th Street became commercial property, and in all probability the commercial district would have continued south except for the case of *City of Little Rock v. Connerly,* 222 Ark. 196, 258 S. W. 2d 881. It now appears that we made a mistake in reversing the decree of the chancery court in granting Connerly the right to put a commercial establishment at 14th and Broadway. In that case, however, twenty property owners joined in an intervention protesting the change in zoning. In the case at bar no property owners have intervened.

For many years there has been a service station at the southeast corner of 14th and Broadway. A large shopping center has been established on the property between 24th and 25th Streets on the east side of Broadway, and there is a large service station on the northwest corner of 25th and Broadway.

As Broadway changed from a residential street to an important commercial thoroughfare, property adjoining the street became progressively undesirable as a family district. Those who built the fine homes originally have moved from the street to other sections of the city. Some of the old homes have become rooming houses; some of the owners of property on the street testified that they cannot get satisfactory tenants who will pay the rent; other houses are vacant and becoming uninhabitable; some have been condemned.

All of the property is worth very little as residential property compared with other property in other sections

of the city. It appears that a large part of the property has been offered for sale, but only a few buyers have been found, and those who have bought a residence on the street in recent years have done so because a very fine house could be bought at a very cheap price because it was located on Broadway. Mr. W. T. Shelton, one of only three people living on the street who gave testimony in opposition to rezoning, testified that he bought a house on Broadway in 1960 for $18,500. He was asked to describe it and he stated: ''Brick, two story, palatial residence, very old. We have 1, 2, 3, 4, 5 rooms downstairs, 5 bedrooms and 2 baths upstairs, ornate. It is a mansion, built about 1910.''

In 1959, Mr. Claibourne Patty, a lawyer, bought a very fine house at 2020 Broadway which had been kept in excellent repair. The former owner had moved to another section of the city, and most of his friends had likewise moved. Mr. Patty stated that the house was built in 1905 and was expensively constructed; that for a relatively modest price he bought a large and ornate house that is a better house than he could afford to buy in another section of the city.

It was shown by numerous witnesses, including Mr. Patty, that south Broadway is not a suitable street to live on if one is rearing children. The street is dangerous due to the traffic; there are no playgrounds; and the only white school serving that end of town has been changed to a school for colored.

Appellees have offered their property at 2115 Broadway, which they seek to rezone, for sale at $15,000 and cannot find a buyer. Mr. A. C. Read, the third person living on Broadway who testified against rezoning, is in the real estate business. He testified that appellees' lot would be worth $15,000 or $17,000 if rezoned, and that appellees were going to tear down a house located thereon that would cost $35,000 to replace. In other words, the appellees can not get $15,000 for the lot with the $35,000 house on it, but can get $15,000 or $17,000 for the lot without the house if it is zoned commercial.

No one can afford to build a house on a lot on Broadway because after construction the property would not be worth what it would cost to build a nice house. If a lot becomes vacant because the house is condemned or is destroyed by fire, it has no value unless the property can be rezoned as commercial. An apartment house could not be built and rented successfully because no parking is permitted on Broadway and one lot would not be large enough to take care of the required parking. According to the undisputed evidence property on Broadway would have a reasonable and satisfactory value as commercial property.

In the case of *Fentress* v. *Sicard,* 181 Ark. 173, 25 S. W. 2d 18, this court said that change is the order of the times and that progress and development should not be hindered or obstructed; that the transition from a residential district into a business district is recognized as appropriate where the value of surrounding property, as business property, would not detract from its value for residential purposes for which it has long since fallen into disuse so far as new and further development is concerned.

In all the circumstances we cannot say the finding of the chancellor that the city authorities acted arbitrarily in refusing to rezone appellees' property is contrary to the preponderance of the evidence.

Affirmed.

McFADDIN and WARD, JJ., dissent.