Conley Byrd, Justice. This zoning case arises out of an application by Harold Thompson, Sr., his sister Mrs. Rebecca Mitchell and Kenneth Storey to rezone a 74,400 square foot plot from R-2 Residential to B-3 Commercial for the purpose of constructing a supermarket. The application was denied by both the Planning Commission and the City Council. The trial court found that the property was adjacent to an established business district and concluded that the City was arbitrary and unreasonable in denying the rezoning. The City of Blythe-ville and a number of property owners as intervenors bring this appeal. The property involved is located between Main Street (Highway 18) on the south, Walnut Street on the North, Walker Blvd. on the east, and Holland Street on the west. The area to be rezoned is shown in the shaded area of appellant’s Exhibit “E” attached hereto as an appendix. The record shows that the downtown business district of Blytheville lies west of and adjacent to Holland Street and all that area is zoned commercial. All of the property fronting on Main Street and south of the subject property between Holland Street on the west and Walker Blvd. on the east is zoned and used as commercial property. Immediately east of Walker Blvd. on the south side of Main Street is a four family apartment building. North of Walnut Street the zoned commercial area extends east from Holland Street approximately 110 feet. Four lots east (each lot being approximately 60 feet) of the commercial area just described, appellee Mitchell owns the property north across Walnut Street from the property sought to be zoned. In the block where the subject property is located an alley between the lots fronting on Walnut and Main Streets extends from Holland to the subject property. Thompson proposes to leave a 175 ft. residential lot owned by him and occupied by his son as a buffer to the residential property to the east. All of the lots fronting on Main ánd west of the proposed supermarket center have been commercial for several years. In 1971 the city zoned a lot (104 X 140) in the southwest corner of the proposed supermarket center for commercial use. It is undisputed that most of the residences in the area are approximately fifteen years old. It is also undisputed that Interstate 55 was opened in 1966 and that since that time Main Street (Highway No. 18) has served as the main traffic artery between the downtown business section of Blytheville and the Interstate. Since that time there has been no further residential construction on Main Street. In fact there has been some commercial development on Main Street from the Interstate interchange back toward the area in question. East beyond the Interstate lies the Blytheville Industrial Park. E. M. Terry, a qualified Real Estate Appraiser, pointed out that the Thompson residence, containing one bedroom and a half bath upstairs and ten rooms and two baths down stairs, is a large house containing a great deal of functional obsolence, lacking in such things as central heat, central air-conditioning and a built-in kitchen. According to him the existing value of the 74,400 square feet under present zoning would be $42,700 as opposed to a value of $100,000 if the commercial use were permitted. The residential property to the west of the subject property on Walnut was described as 900 to 1,000 square feet residences ranging in value from $9,500 to $13,500. He pointed out that the commercial area on Main Street was in existence when those houses were built. Mr. Terry also pointed out that appellee Mitchell owned about 400 feet of the frontage on the north side of Walnut across from the subject site. That property contained four low cost rent houses ranging in value from $3,000 to $4,000. In addition to describing the service stations, drive-ins and bar taverns located on Main across from the block in which the subject property is located, he described the residential area to the east of Walker Blvd. as containing residences valued somewhere from $18,000 to $28,000. He pointed out that Mr. Tyrone, the owner of property at 717 Main, being east of the proposed supermarket, had an 18 X .20 ft. office on the side of his carport that he used as the business office of Acme Termite Company. He pointed out that since 1966, the daily traffic count between down town Blytheville and the Interstate had increased from 5,000 to 6,000 vehicles per day to 10,200. Because of the location of the Blytheville Industrial Park and the buildup of the commercial area around the Interstate interchange, he expressed the opinion that the daily traffic count on Main Street would continue to increase. In concluding that the highest and best use of the subject property was for commercial purposes, he stated that in his opinion the construction of the supermarket would have a minimal effect on the residences in the area. In making this conclusion he pointed to the negative influences already created and his observation of other commercial encroachments in the City of Blythe-ville. Thomas L. Hodges, a City Planning Consultant, testified to a comprehensive Development Plan recently adopted by the City in which the subject property was designated as residential. It was his opinion that commercial development should not be allowed to occur in that area except for a buffer type use. According to him a buffer type concept provides that there should be a gradual transition so that a minimum amount of nuisance and conflict would occur. He did not consider the residence occupied by Thompson Jr., the 175 foot lot adjacent to Walker Blvd., as a buffer. According to him the rezoning would have an adverse effect from noise, lights and increase in traffic and would be the first commercial development to intrude on Walnut, east of the established business area. It was his view that the entire area on three sides of this property was composed of substantial well kept residential property which should be preserved in the comprehensive zoning plan. He also stated that if the rezoning petition is granted, the City would have to make further modifications in the traffic pattern. On cross-examination after stating that the daily traffic count on Main Street was at least .10,-000 vehicles and increasing, the following occurred: “Q. In other words, we have a busy thoroughfare there? A. Yes, sir. Q. Would you say the homes in that area from Walker Blvd. along Main Street east are desirable residences for the rearing of children? A. Yes, sir. Q. You don’t think the heavy traffic would affect them. A. I am sure it might have some effect but they have back yards and that is where the children normally play. Q. I believe you said, in your opinion, the building of this grocery store would not greatly increase the traffic? A. I didn’t say that. I said that other considerations were more important than what the increase was on Main Street and as a proportionate ratio of traffic on Main Street I would think that the increase would not be that substantial.” Richard Reid, an Attorney and Chairman of the City Planning Commission testified that the City Planning Commission unanimously recommended that this rezoning petition be denied. It was his feeling that it would adversely affect the adjoining residential property and particularly the property on Walnut Street that would be blocked off to itself and left stranded. Having it zoned from street to street and having parking and an open area clear through, it would be a traffic flow from Walnut to Main and increase traffic problems on both streets. The other reason he felt that it should not be rezoned was that this was not an expanding commercial area. There was property in the area not too far west which was vacant and needed to be developed. There was no need to expand the commercial area. On cross-examination Mr.,. Reid stated that the property west of the subject property on both sides of Main is commercial, but it has been frequently vacant, has got vacacies there now and there is property for sale in this area. The “Tonks” are in the area. Commercial development normally moves from the downtown area if it is needed, but there is an area within the downtown area that is for sale and should be developed before any further development occurs. There was no need for expansion in this area at this time, it has a good use as a residential area, there is a substantial home on it and he did not feel that the commercial area needed to be extended. Clarence E. Johnson, a certified public accountant, testified that there was no projection of commercial property on Walnut Street anywhere in that area and that if this rezoning is permitted the residences on Walnut, west of the subject property, would be penned in and isolated and the values thereof would decrease considerably. On cross-examination Mr. Johnson admitted that when he built his home at 713 Main, the first commercial property on the south side of Main was the Tastee Freeze (625 Main), and the next buildings were the “Tonks” and “Joint”. On the north side was the old F. L. Wicker building and the concrete building Mr. Abbott owns. Going back west was the Jack Robinson’s Gin and then Gilbert’s Upholstery. The Gulf Station east of the Tastee Freeze and the Mini Mart have been built since he built his home in 1956. Denny Wilson, a member of the City Council, testified that a supermarket of the caliber that the Storey Brothers have built in the city already would be a nuisance to that area. Furthermore it would create a traffic problem and would cause a devaluation of the property in the area. After pointing out that he was alderman for the ward where the property is located, he was asked if he saw any problems with the location of a big supermarket on the subject property. Mr. Wilson answered as follows: “A. Yes, particularly to the traffic situation, due to the new extension of the one-way streets. Yes, sir, I do, there is a number of things I base that on because Highway 18 will eventually be divided in this area and one-way traffic is going to be going to Walnut Street, one-way traffic going west and one-way traffic on Ash would be entering into State Highway 18 on the eastern flow, this already is a problem here for entering because of the heavy traffic and because of this man running a used car lot, Mr. Gilbert on this corner, we have had a lot of complaints about that— Q. Is that also in an R-2 Zone? A. Yes, Sir. Q —Then in the winter time especially, this part of the highway is hard to get into because of the steep incline and if there is a little ice or something on there it also creates a great problem. Eventually, if this building is built here as has been proposed, this would throw, all the western traffic and make North Walker Blvd. an expressway between Main Street and Walnut Street to handle the large trucks that will be setting out here about 27 feet in the the street, according to the proposal of building to be erected here. Generally those trucks, those trailer trucks are about 40 feet long, with a 15 foot dock so that will put 27 out in the street. We already have a problem on Walnut Street because of people coming in off of interstate, Main Street can’t carry it so they turn on Walnut one block and then come through to town the best way they can. We have a moving and storage business over there that also parks trucks out in front for loading ánd unloading. It is an established business but it creates complaints and problems which we voice to them to try to get that cleared up, so all in all the whole picture all the way around causes traffic problems and it looks to me this new business would create a problem.” Thereafter the following occurred: . “THE COURT: I wasn’t quite clear, this witness mentioned something about they planned to create one-way streets. I didn’t quite follow that. Is Main Street going to be created into a one-way affair there? WITNESS: No, sir, it will come in at the corner of Laclede, Ash will come into Main at the corner of Laclede which is about, oh, I guess, about 150 or 200 feet from the property we are talking about. THE COURT: What about Walnut, is it going to be created into a one-way street? WITNESS: Yes, sir, beginning at Laclede. THE COURT: In other words, it won’t come east to where this property is? WITNESS: The starting of the one-way part that you are talking about? THE COURT: Yes, sir. WITNESS: No, sir, it will not.” Bob McHaney, a member of the City Council, testified that the homes in the 700 block on East Main were well kept — he would call them prestige homes. He, while recognizing the increase in traffic on Main Street, opposed the rezoning because it would be the first commercial development beyond Holland Street on Walnut and because it would increase the traffic flow and traffic problem. On cross-examination, he testified as follows: “Q. Mr. McHaney, are you aware of the fact there is an established business district starting from this property all the way back to down town? A. On Main Street, yes. Q. To rezone all this property would be simply extending the present B-3 zone? A. Yes, sir. Q. Do you have any objections to grocery stores or supermarkets? A. No I have no objection to grocery stores, I eat out of them, they furnish my food.” We have consistently recognized that zoning ordinances are valid as against constitutional objection, only by reason of the police power, City of Little Rock v. Andres, 237 Ark. 658, 375 S.W. 2d 370 (1964), and that such ordinances must bear some definite relation to the health, safety, morals and general welfare of the inhabitants of that part of the city, City of Little Rock v. Sun Building & Developing Co., 199 Ark. 333, 134 S.W. 2d 583 (1939). In a number of cases, we have recognized that a residential restriction is arbitrary and unreasonable where traffic conditions have substantially reduced the residential value of property in an area. See City of Little Rock v. Andres, supra, and City of Little Rock v. Gardner, 239 Ark. 54, 386 S.W. 2d 923 (1965). In the Sun Building & Developing Co. case, supra, it was pointed out that a refusal to rezone property because other available property is already zoned for such purposes can create a monopoly contrary to Art. 2 § 19 of the Arkansas Consi tution. Finally in Little Rock v. Pfeifer, 169 Ark. 1027, 277 S.W. 883 (1925), in dealing with the refusal of a city to rezone property adjacent to an existing business district, we said: “...There is substantial evidence tending to show that the value of some of the adjacent residence property will be depreciated on account of the lessening of usable value of the property for residence purposes, but we do not think that this affords justification for interfering with the gradual expansion of the business district, which has already been established. As the size of the business district grows, it ceases to be a residence district to that extent within the purview of the zoning ordinance, and any attempt on the part of the city council to restrict the growth of an established business district is arbitrary. When a business district has been rightly established, the rights of owners of property adjacent thereto cannot be restricted, so as to prevent them from using it as business property. It is the contention of the protestants that residence property adjacent to a business district becomes, on that account, less desirable for residence use. Conceding this to be true, and it is undoubtedly true, in a sense, that property thus located is not as desireable as residence property, it demonstrates the right of owners of borderline property between residence and business district to use their property for either purpose. In other words, if it has become less desirable for residence property because of its proximity to the business district, they have the legal right, without interference, to use it for business purposes. ...” In the case at bar there is no doubt that the property in question is adjacent to existing business property and the trial court correctly held that the refusal to rezone was arbitrary. Affirmed. Harris, C.J., and Fogleman, and Jones, JJ., dissent.